UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-80162-CR-CANNON

UNITED STATES OF AMERICA

vs.

JOSEPH ADDISON MARTIN, and
JOSEPH ROBERT STEWART,

      Defendants.
_____/

**GOVERNMENT'S SENTENCING MEMORANDUM AS TO
DEFENDANT JOSEPH ROBERT STEWART**

**COMES NOW**, the United States of America, by and through its undersigned attorneys, and respectfully submits this sentencing memorandum as to Defendant Joseph Robert Stewart.

Crimes involving the sexual abuse of children are incalculably serious. Offenders who traffic in child pornography inflict grave, lifelong trauma on their victims. And far too often, these victims go unidentified, meaning their suffering goes unvoiced. As one court put it,

> [c]hild pornography is a vile, heinous crime. Mention the term to your average American and he responds with immediate disgust and a sense of unease. However, once it enters the legal system, child pornography undergoes sterilization. The sterilization goes far beyond properly removing emotion from sentencing decisions. Images are described in the most clinical sense. Victims all too often remain nameless. The only emotions on display are those of defendants, sorry that their actions were discovered by law enforcement.

*United States v. Cunningham*, 680 F. Supp. 2d 844, 847 (N.D. Ohio 2010).

This is an exceptionally serious case, even by the standards of these "vile, heinous crimes." Here, the defendant helped manage a website where thousands of users trafficked in millions of images and videos depicting the sexual exploitation, abuse, and even torture of such victims. Given the offense conduct, the government respectfully recommends that the Court sentence the

defendant to a within-Guidelines term of imprisonment of 310 months. This sentence is fully justified by the 18 U.S.C. § 3553(a) factors, and it is consistent with the sentences this Court has already handed down to a number of the defendant's co-conspirators.

## BACKGROUND

The defendant is before this Court for sentencing after pleading guilty to conspiring to advertise and distribute child pornography. Unlike many child-pornography offenders, the defendant's offense conduct is not limited to isolated incidents of downloading child sexual abuse material ("CSAM") from the internet. His conduct instead centers around his considerable involvement with "Website A," which was a private meeting place on the Dark Web to discuss and share material depicting the sexual abuse of infants and toddlers, violent and sadistic CSAM, and other illegal material. For years, this site provided a large and active community for thousands of offenders from around the world to explore their shared sexual interest in children. In this sense, Website A was a sanctuary for pedophiles, with users constantly validating each other's conduct, sharing tips on how to abuse children and avoid detection, and emboldening each other to escalate their behavior. Propping up this international criminal enterprise was a dedicated group of moderators and staff—select users with elevated status based on their active participation and sharing of CSAM—who voluntarily worked around the clock to screen new users for membership and ensure that things ran smoothly by encouraging and monitoring other users' advertisement of CSAM.

The defendant, Joseph Robert Stewart, was one of these staff members. On the outside, he lived a normal enough life. He resided in the Seattle area with his elementary school special-education teacher wife and family, worked as a network administrator for a manufacturing company, and served as a volunteer karate instructor to children and adults at the local YMCA.

But online, things were different. There, the defendant volunteered his time somewhere other than the YMCA. He joined and rose through the ranks of Website A until he became one of the highest-ranking staff members on the website, which had thousands of users. He helped manage the website, and he shared images of young children being sexually abused and displaying their naked genitals. In August 2023, nearly three years after he first joined Website A, the FBI searched his home and arrested him.

After his arrest, a federal grand jury in the Southern District of Florida returned an indictment charging the defendant with two counts: conspiracy to advertise child pornography, in violation of 18 U.S.C. § 2251(d) and (e), and conspiracy to distribute child pornography, in violation of 18 U.S.C. § 2252A(a)(2) and (b)(1). [ECF No. 13.] In January of this year, the defendant pleaded guilty to both counts without a plea agreement. [ECF Nos. 48, 50, 57.]

Given the severity of the defendant's conduct and his enhanced role in developing and tending to this community of child sex offenders, the United States submits that a within-Guidelines sentence of 310 months is lawful, just, and appropriate here.

## SENTENCING ANALYSIS

"In sentencing a defendant, first the district court 'shall consider ... the kinds of sentence and the sentencing range established for ... the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines.'" 18 U.S.C. § 3553(a)(4)(A). The Sentencing Guidelines are thus the appropriate starting point from which the Court exercises its discretion under § 3553(a). *See United States v. Crawford*, 407 F.3d 1174, 1178–79 (11th Cir. 2005). This Court therefore "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v.*

3

*United States*, 129 S. Ct. 890, 891-92 (2009).

I. THE APPLICABLE SENTENCING GUIDELINES

The U.S. Probation Office filed a final presentence investigation report containing the following Guidelines calculation:

| Guideline | Offense Level |
|---|---|
| Base Offense Level (U.S.S.G. § 2G2.2(a)(2)); | 22 |
| Enhancement for trafficking in material that involved a prepubescent minor and a minor who had not attained the age of 12 years (*id.* § 2G2.2(b)(2)); | +2 |
| Enhancement for distributing in exchange for non-pecuniary consideration (*id.* § 2G2.2(b)(3)(B)); | +5 |
| Enhancement for trafficking in material that portrays masochistic conduct or other depictions of violence or sexual abuse of exploitation of an infant or toddler (*id.* § 2G2.2(b)(4)); | +4 |
| Enhancement for use of a computer or interactive computer service for receipt of child pornography (*id.* § 2G2.2(b)(6)); | +2 |
| Enhancement for an offense involving more than 600 images (*id.* § 2G2.2(b)(7)(D)); | +5 |
| Enhancement for being a manager/supervisor of criminal activity involving more than five individuals (*id.* § 3B1.1(b)); | +3 |
| Reduction for demonstration of acceptance of responsibility (*id.* § 3E1.1(a)); | -2 |
| Reduction for timely notification of intent to plead guilty (*id.* § 3E1.1(b)).[1] | -1 |
| **TOTAL:** | **40** |

[ECF No. 64 ("PSR") ¶¶ 118-31.] This calculation is accurate and reflects the facts underlying the defendant's offenses and his other relevant conduct. The PSR further places the defendant in Criminal History Category I, which results in a Guidelines sentencing range of 292 to 365 months. [PSR ¶¶ 134, 174.]

The PSR also correctly notes that the defendant is subject to a mandatory minimum term

---

[1] If the Court determines that the defendant has accepted responsibility and is entitled to a two-level reduction under U.S.S.G. § 3E1.1(a), the United States moves to adjust the defendant's offense level downward by one level pursuant to § 3E1.1(b) for timely notifying the government of his intention to plead guilty.

of imprisonment of 15 years, a mandatory minimum term of supervised release of five years, a maximum fine of $250,000 per count of conviction, a special assessment of $100 per count of conviction under 18 U.S.C. § 3013, a potential $5,000 special assessment per count of conviction under 18 U.S.C. § 3014, and an additional special assessment of up to $35,000 per count of conviction under 18 U.S.C. § 2259A.  [*Id.* ¶¶ 173-85.]  Finally, the defendant is required pursuant to 18 U.S.C. §§ 2259 and 2259A to pay restitution in the full amount of the losses that were incurred by any victims as a result of his child-pornography-related conduct. [*Id.* ¶ 186.]

The defendant has objected to one aspect of this Guidelines calculation. [ECF No. 62.] The United States has explained why this objection should be overruled. [ECF No. 66.]

**II.     THE 18 U.S.C. § 3553(A) FACTORS WARRANT A 310-MONTH SENTENCE**

In this case, there are no factors that warrant a variance or departure from the Guidelines range.  In particular, § 3553(a)(1) provides that courts must consider the nature and circumstances of the offense as well as the history and characteristics of the defendant in crafting a sentence. Additional factors outlined in § 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense; promote respect for the law; provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide the defendant with needed education or vocational training, medical care, or other corrective treatment in the most effective manner. Section 3553(a) also instructs courts to consider the need to avoid sentencing disparities between similarly situated defendants. *See* 18 U.S.C. § 3553(a)(6). Careful consideration of these factors confirms that a within-Guidelines sentence of 310 months is sufficient but not greater than necessary to achieve the purposes set forth in § 3553(a).

        **A.     The Nature and Circumstances of the Offenses**

The final PSR provides a thorough overview of Website A and the conduct of the defendant

and his co-conspirators. [PSR ¶¶ 5-91.] In short, Website A was a sprawling and complex criminal enterprise catering to pedophiles and enthusiasts of CSAM. Anyone who encountered it would have immediately understood that it was dedicated to the exchange of images and videos depicting the rape, abuse, and exploitation of minors. Users of the website—of which there were thousands—trafficked in large volumes of CSAM and discussed the sexual abuse of minors for years. [*Id.* ¶¶ 5, 17]. This high volume of activity was by design: the users who ran the site required other users to share CSAM in order to gain greater access to the site.

But Website A was more than just a website or a place to acquire CSAM. It was a flourishing community where offenders could come together, discuss their interests, share information, provide advice on how to avoid law enforcement, and normalize one another's sexual desire for young children. Offenders who gravitate to these sorts of communities are more dangerous than other trafficking offenders—like those who obtain their CSAM through more impersonal methods of distribution—because it is in these online communities where offenders validate their sexual interest in children "so that actual sexual contact with a child no longer seems as wrong" and the step from possession to production of CSAM no longer seems as drastic. *United States v. Klear*, 3 F. Supp. 3d 1298, 1304 (M.D. Ala. 2014). And, to make matters worse, the technology underlying Website A was designed to allow these offenders to engage in these activities anonymously but openly, and with a measure of assurance that their crimes would not be detected. [PSR ¶ 5.]

All of this was possible because of the dedicated work of the defendant and the other staff of Website A, who facilitated CSAM offenses on a massive, global scale. The conduct and the concomitant harm the defendant caused was both real and significant. Indeed, as a high-ranking staff member of Website A, the defendant was responsible for overseeing user activity in various

6

chat rooms on the site, including by muting users, correcting users' posts, and counseling them on how to attain greater status on Website A and avoid being arrested. [PSR ¶¶ 93, 98(a).] He rose through the ranks on Website A to become one of the ten to twelve highest-ranking staff members who participated in staff meetings, and in this capacity, he regularly interacted with the very highest-ranking leaders of the website. [*Id.*]

In fact, the defendant had a critical role on Website A that few others had. He was part of a small, select "working group" of staff members chosen to curate a highly exclusive and desirable room on Website A that contained vast quantities of child pornography. [PSR ¶¶ 10(f), 82, 94.] In his role on this "working group" he worked directly with Website A leader William Spearman, co-defendant Joseph Martin, and others to ensure the smooth functioning of this room. He also kept watch over Website A for other users who had contributed enough child pornography to the website to earn entry into the room. [*Id.* ¶ 94.]

The defendant didn't just make sure child pornography was available on Website A; he posted it himself. Indeed, he posted a significant quantity of child pornography, including depictions of prepubescent children being sexually penetrated. [PSR ¶¶ 95, 98(e).] He told the FBI that he was recognized by Website A staff for the quantity of child pornography he posted. [*Id.* ¶ 98(a), (c), (e).]

The defendant was therefore not a casual, tepid, or conflicted participant in this criminal enterprise. Instead, he fully committed himself to Website A, was promoted to the upper echelon of members who oversaw the thousands of lower-level users on the site, and spent significant amounts of time ensuring that the website functioned properly and that others followed the rules. This was not a crime of opportunity or the result of a momentary lapse of judgment. To the contrary, the defendant's crimes took sustained planning, effort, and time.

Although this Court must consider other factors beyond the defendant's offense conduct, this Court should nonetheless give significant weight to his activity on Website A at sentencing. *See, e.g.*, *United States v. Croteau*, 819 F.3d 1293, 1309 (11th Cir. 2016) ("The weight given to any specific § 3553(a) factor is committed to the sound discretion of the district court.").

### B. The History and Characteristics of the Defendant

The defendant's history and characteristics also weigh strongly in favor of a within-Guidelines sentence of 310 months. To suggest that the Defendant has no recent criminal history would miss the mark. While he was active on Website A and other websites, the defendant engaged in extensive criminal conduct for years on end. [PSR ¶¶ 92, 96, 98(a), (g).] The operation of Website A required constant monitoring of user activity, which the defendant gladly provided in his role as a staff member.

Nor was the defendant's activity on Website A his first foray into the world of child exploitation. He admitted to being on other child pornography websites before and after Website A. [PSR ¶¶ 96, 98(b), (g).] This to be expected, as it is exceedingly difficult for a user to stumble upon a dark web website unintentionally. *See United States v. Taylor*, 935 F.3d 1279, 1283 (11th Cir. 2019) ("You can't just Google a hidden service; rather, a user can access one of these Tor-specific sites only by knowing its exact URL address."). Sites like Website A are therefore usually "shared via message-board postings on the regular internet or by word of mouth" among those who traffic in the sites' content. *Id.* In other words, it is clear from his conduct and statements that he—like his co-conspirators—is a particularly savvy, experienced, and eager consumer of CSAM.

The Court should also conclude that the defendant was motivated to commit these offenses by his sexual attraction to prepubescent children. He admitted to the FBI that he is attracted to

8

underage girls and has masturbated to child pornography. [PSR ¶ 98(h).] He regularly posted and collected links on Website A depicting the sexual abuse and exploitation of prepubescent girls, including girls as young as seven years old. [*Id.* ¶ 98(e).] The FBI also found thousands of files of CSAM on devices in his home, including content depicting the sexual abuse of infants and toddlers, children bound and tied up, and a girl being forced to perform sex acts on a dog. [*Id.* ¶ 100.]

The only conceivable explanation for this conduct is that the defendant harbors a deeply rooted sexual interest in children. This is of particular concern given that there is reason to believe the defendant is very tech-savvy and thus less likely to be caught in the future than the average CSAM offender. As outlined above, he is a sophisticated and likely experienced consumer of CSAM, which he parlayed into a leadership role on Website A. He understood the importance of using the Dark Web as a means to avoid detection and specifically cautioned other users on how to limit their exposure to law enforcement. He also took steps to conceal his criminal conduct from those closest to him, including his wife and children. He is therefore far more capable than an average offender of continuing to commit online CSAM offenses without detection.

Finally, the history and characteristics of the defendant as set forth in the PSR make clear that he had all the opportunities, resources, and support he needed to live a law-abiding life. He was not corralled into this criminal conduct by poor life circumstances or unfortunate events. Rather, he chose his path, and his sentence should reflect that fact.

    **C.**    **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment**

It is beyond dispute that crimes involving the trafficking of CSAM are serious and warrant significant sanctions. As "[l]ong-term studies" have confirmed, "sexual abuse is grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual

9

development in ways which no just or humane society can tolerate." *United States v. Irey*, 612 F.3d 1160, 1207 (11th Cir. 2010) (en banc) (collecting authority). The fact that the defendant's conduct of conviction does not involve him committing hands-on acts of child sexual abuse does not lessen the significance of his predatory and criminal behavior. Contrary to what some may suggest, trafficking in CSAM inherently involves the sexual abuse of children, even if no new contraband is produced. *See New York v. Ferber*, 458 U.S. 747, 759 (1982). In fact, as explained above, the defendant's community-building activity on Website A here very likely played a role in encouraging other users to escalate from possession to production of CSAM. Accordingly, far from being victimless, trafficking in CSAM "harms children in part because it drives production [of CSAM], which involves child abuse." *Paroline v. United States*, 572 U.S. 434, 439 (2014).

Trafficking in CSAM also results in perpetual harm to children who have already been sexually abused, all of whom are grappling with the indelible trauma caused by that abuse. *See id.* at 440. As another court noted, "[i]t is well established that children featured in child pornography are harmed by the continuing dissemination and possession of that pornography. Such images are 'a permanent record of the children's participation and the harm to the child is exacerbated by their circulation.'" *United States v. Burgess*, 684 F.3d 445, 459 (4th Cir. 2012) (quoting *Ferber*, 458 U.S. at 759). Accordingly, "[e]very instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse." Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 501(2)(D), 120 Stat. 587, 624 (2006) (codified at 18 U.S.C. § 2251 note); *see also United States v. Sherman*, 268 F.3d 539, 547 (7th Cir. 2001) (recognizing that "[t]he possession, receipt and shipping of child pornography directly victimizes the children portrayed by violating their right to privacy, and in particular violating their individual interest in avoiding the disclosure of personal matters"). These children,

"who must live with the knowledge that adults like [the defendant] can pull out a picture or watch a video that has recorded the abuse of [them] at any time," "suffer a direct and primary emotional harm" when offenders consume, receive, and advertise this CSAM. *Sherman*, 268 F.3d at 547-48.

In light of the very serious harm caused by the defendant's conduct—and the equally serious harm that would befall his victims if he were to recidivate—it is particularly important that this Court craft a sentence that provides just punishment. 18 U.S.C. § 3553(a)(2)(A). As the Eleventh Circuit has observed, "because punishment should fit the crime, the more serious the criminal conduct is the greater the need for retribution and the longer the sentence should be. The seriousness of a crime varies directly with the harm it causes or threatens. It follows that the greater the harm the more serious the crime, and the longer the sentence should be for the punishment to fit the crime." *Irey*, 612 F.3d at 1206. The *Irey* court cited the Senate Report regarding this provision:

> This purpose—essentially the "just deserts" concept—should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense.

*Id.* (quoting S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59).

Put differently, punishment is the way in which society expresses denunciation of wrongdoing, and it is thus essential that this Court promote and maintain respect for the law by pronouncing sentences that fully reflect society's revulsion toward the sexual abuse of children. *See Gregg v. Georgia*, 428 U.S. 153, 184 n.30 (1976) (citing Royal Commission on Capital Punishment, Minutes of Evidence, Dec. 1, 1949, p. 207 (1950)). In this sense, retribution is a particularly valid penological goal in a case like this one, where the defendant's crimes caused unfathomable harm to our society's most vulnerable victims.

This Court must also consider the need to "promote respect for the law" at sentencing. 18 U.S.C. § 3353(a)(2)(A). Congress enacted federal criminal laws targeting CSAM trafficking to address ongoing sexual abuse and victimization of children. S. Rep. 95-438, 5, 1978 U.S.C.C.A.N. 40, 42-43, 56. But this legislation and its later amendments are more than prophylactic measures. They reflect value judgments and the accepted moral norms of our society. As one Senate Judiciary Committee report concluded: "the use of children…as the subjects of pornographic materials is very harmful to both the children and the society as a whole," describing the conduct as "outrageous." S. Rep. 95-438, 5, 1978 U.S.C.C.A.N. at 43.

Against this backdrop, the defendant did not just violate federal law, he also transgressed universally recognized moral principles—specifically, the need to protect and nurture children and not to be titillated by depictions of their rape and abuse. Through his own conduct and the conduct that he facilitated through his moderation and support of Website A, the defendant exploited thousands upon thousands of children and helped to revictimize them through the continued trafficking in material depicting their abuse. This Court should craft a sentence that appropriately expresses social condemnation of the defendant's crimes, captures the serious harm he has caused, and promotes respect for the rule of law. The government's recommended sentence of 310 months' imprisonment does all three.

    **D.**   **The Need for the Sentence Imposed to Afford Adequate Deterrence and Protect the Public**

Both specific and general deterrence call for a significant sentence consistent with the Guidelines recommendation here. With respect to specific deterrence, the risk the defendant poses to children is immense. His crimes are easily explained by way of analogy: "How many people who collect baseball cards have also played the game (or would play, if given the opportunity)? In other words, do the things we collect reflect our fantasies and interests? An answer in the

12

affirmative seems obvious." *Handbook of Behavioral Criminology*, p. 332, edited by Dr. Vincent B. Van Hasselt and Dr. Michael L. Bourke, Springer Intl. Publishing (2017). Here, the defendant collected cards in the form of sexually explicit images and videos of children. But when collecting and viewing this material, he was not simply fantasizing about expanding the list of images and videos he had viewed. Common sense instructs that he was viewing this material because he very much desired the opportunity to engage in the abusive sexual conduct he observed. And as the Supreme Court has noted, there are "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class." *Smith v. Doe*, 538 U.S. 84, 103 (2003). The defendant now fits squarely within that class. The sentence imposed must therefore protect the public and account for the specific danger he poses to minors.

More generally, "the deterrence objective of sentencing is 'particularly compelling in the child pornography context.'" *Irey*, 612 F.3d at 1211 (citation omitted). "[I]mposing a lighter sentence on one convicted of a child pornography offense 'tends to undermine the purpose of general deterrence, and in turn, tends to increase (in some palpable if unmeasurable way) the child pornography market.'" *Id.* (citation omitted). As the Eleventh Circuit noted in a similar case, "[y]oung children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded—both consumed himself and disseminated to others." *United States v. Pugh*, 515 F.3d 1179, 1194 (11th Cir. 2008) (quoting *United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007)). The same is true here. And given that "sentences influence behavior," it follows that "the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so the more will be produced." *Id.* For this reason, "general deterrence is crucial in the child pornography context." *United States v. Bistline*, 665 F.3d 758, 767 (6th Cir. 2012) (quoting *United States v. Camiscone*, 591 F.3d 823,

13

834 (6th Cir. 2010)) (punctuation altered). In recognition of the importance of deterring both the defendant and others from engaging in this sort of criminal conduct in the future, the United States submits that a sentence of 310 months is appropriate.

### E. The Need to Avoid Unwarranted Sentencing Disparities and the Kinds of Sentences Available

#### 1. The United States' recommendation is consistent with the Court's treatment of other co-conspirators

The United States' 310-month sentence is also consistent with the sentences this Court has handed down to the defendant's co-conspirators already. To date, the Court has sentenced five defendants for their involvement in the leadership of Website A. Two of those defendants—William Spearman and Selwyn Rosenstein—were higher-ranking on Website A and are thus more culpable than the defendant. The Court sentenced Spearman to life in prison and Rosenstein to 28 years in prison. Because of his advanced age, Rosenstein's sentence is very likely an effective life sentence. The defendant's sentence should thus be lower than the sentences for Spearman and Rosenstein. (The defendant is also less culpable than co-defendant Joseph Martin, who will be sentenced on the same day as the defendant. The United States will address Martin's sentencing factors in a separate memorandum.)

The defendant's sentence, however, should be higher than the sentences for two less-culpable defendants, Robert Boyles and Matthew Garrell. The Court sentenced Boyles to 280 months in prison and Garrell to 250 months. Boyles and Garrell were both lower-ranking members of Website A management than the defendant. Both were room moderators and neither had attained enough status to participate in staff meetings that included the top ten to twelve leaders of the website. [PSR ¶ 108.] In addition, neither Boyles nor Garrell played any role analogous to the defendant's role in the "working group" dedicated to ensuring the smooth functioning of the

exclusive child pornography room on Website A described above. [*Id.*]

Of the conspirators sentenced so far, the defendant's culpability most matches that of Gregory Good, whom the Court sentenced to 310 months in prison—the exact sentence the United States seeks for the defendant here. For example, both Good and the defendant were part of the ten to twelve top-most staff members who participated in staff meetings where the leaders discussed the management of the website. Neither of them, however, was part of the absolute highest echelon of Website A management, which included Spearman, Rosenstein, Martin, and few others.[2] The defendant may even be slightly more culpable than Good, who did not participate in the "working group" of which the defendant was a part. In other respects, however, the United States believes their culpability for Website A is generally analogous.

2. The United States' recommendation is appropriate

While the aggravating factors in this case are significant, a sentence of 310 months also accounts for the few mitigating factors that exist—most notably, the defendant's prompt acceptance of responsibility. A 310-month sentence falls within the lower half of the defendant's Guidelines sentencing range of 292 to 365 months. This range already reflects the three-point reduction under U.S.S.G. § 3E1.1 for his acceptance of responsibility and timely guilty plea, without which his Guidelines range would be even higher.

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court sentence the defendant to 310 months in prison, followed by a lifetime of supervised release.

---

[2] This highest echelon did, however, include Keith McIntosh, who was recently arrested by the FBI for his involvement with Website A and charged by criminal complaint in this district, and who is expected to be pending trial before the Court soon. *See United States v. McIntosh*, No. 9:24-mj-08152 (S.D. Fla.).

15

Respectfully submitted,

Steven J. Grocki
Chief
Child Exploitation and Obscenity Section

By: *s/Kyle P. Reynolds*
Kyle P. Reynolds
William G. Clayman
Trial Attorneys
U.S. Dept. of Justice, Criminal Division
Court ID # A5502872
1301 New York Avenue, NW
Washington, DC 20005
Phone: (202) 616-2842
Email: kyle.reynolds@usdoj.gov

Gregory Schiller
Assistant United States Attorney
Fla. Bar. 048477
500 S. Australian Ave., Suite 400
West Palm Beach, FL 33401
Phone: 561-209-1045
Email: gregory.schiller@usdoj.gov

16

**CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that on April 8, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record on the attached Service List in the manner specified.

          *s/Kyle Reynolds*
          Kyle Reynolds
          Trial Attorney
          U.S. Department of Justice, Criminal Division